

ASJZ/SLT/TH: USAO2021R00304

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | **CRIMINAL NO.** RDB-24-21 |
| | * | |
| v. | * | (Conspiracy to Commit Securities |
| | * | Fraud and Wire Fraud, 18 U.S.C. |
| **SAM LEE,** | * | § 371; Forfeiture (18 U.S.C. §§ 982, |
| | * | 1030(i), 21 U.S.C. § 853, and 28 |
| Defendant. | * | U.S.C. § 2461(c)) |
| | * | |
| | * | **UNDER SEAL** |
| | * | |

******

## INDICTMENT

## COUNT ONE

**(Conspiracy to Commit Securities Fraud and Wire Fraud)**

The Grand Jury for the District of Maryland charges that:

At all times relevant to this Indictment:

### Relevant Entities, Individuals, Terms

1. HyperFund, a/k/a "HyperTech," a/k/a "HyperCapital," a/k/a "HyperVerse," a/k/a "HyperNation" (collectively, "HyperFund") was an unincorporated organization established in approximately June 2020. HyperFund operated a purportedly legitimate decentralized finance, or "DeFi," cryptocurrency investment platform and touted its investment program to the public through social media and other means. In truth, HyperFund was a global securities fraud and wire fraud scheme that obtained approximately $1.89 billion from victim-investors world-wide.

2. HyperFund conducted its business principally by means of websites, including http://thehyperfund.online, https://thehyperfund.com/, https://h5.thehyperverse.net/, and

https://www.thehyperverse.net/ (collectively, the "HyperFund Websites"). The HyperFund Websites were accessible worldwide to the public, including to prospective investors residing within the District of Maryland.

3. Defendant **SAM LEE ("LEE")** was a citizen of Australia and resident of the United Arab Emirates. **LEE** was a co-founder of HyperFund.

4. Brenda Chunga, a/k/a "Bitcoin Beautee" ("CHUNGA") was a resident of the District of Maryland. CHUNGA was a promoter of HyperFund.

5. The United States Securities and Exchange Commission ("SEC") was an independent agency of the executive branch of the United States government. The SEC was responsible for enforcing federal securities laws and promulgating rules and regulations in keeping with the same.

6. "Cryptocurrency" was a digital currency in which transactions were verified and records were maintained by a decentralized system using cryptography, rather than a centralized authority such as a bank or government. Like traditional fiat currency, there were multiple types of cryptocurrencies, such as Bitcoin (BTC) and Tether (USDT).

7. DeFi generally referred to various financial applications, or technology, in blockchain and cryptocurrency that sought to remove centralized institutions, third parties, and other intermediaries from financial transactions. Many DeFi applications were built on top of the Ethereum blockchain. Ethereum's platform allowed smart contracts to be deployed directly to the blockchain.

8. Under Title 15, United States Code, Section 77b(a)(1), a "security" included a wide range of investment vehicles, including "investment contracts." Investment contracts were instruments, schemes, or transactions through which a person invested money in a common

enterprise and reasonably expected profits or returns derived from the entrepreneurial or managerial efforts of others. Federal law required that an issuer of securities register offers and sales of those securities with the SEC when the issuer offered and sold securities to the public, absent certain specified exemptions.

### The Conspiracy

9. From in or about June 2020 through at least in or about November 2022, in the District of Maryland and elsewhere, the defendant herein,

**SAM LEE,**

did knowingly and intentionally conspire and agree with others, known and unknown, including CHUNGA, to commit an offense against the United States, namely:

(a) securities fraud, in violation of Title 15, United States Code, Section 78j(b) and 78ff and Title 17, Code of Federal Regulations, Section 240.10b-5; and

(b) wire fraud, in violation of Title 18, United States Code, Section 1343.

### Purpose of the Conspiracy

10. It was a purpose of the conspiracy for **LEE** and his co-conspirators to unjustly enrich themselves by: (a) inducing investors to invest in HyperFund through materially false and fraudulent pretenses, representations, and promises regarding the returns that investors would earn on their investments; and (b) concealing the misappropriation of investors' funds for their own personal use and benefit.

### Manner and Means of the Conspiracy

11. It was part of the conspiracy that **LEE** and his co-conspirators conspired to commit securities violations and execute the scheme to defraud through the following manner and means:

12. It was part of the conspiracy that **LEE** and his co-conspirators willfully and knowingly, directly and indirectly, by the use of the means and instrumentalities of interstate commerce, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, contrary to Rule 10b-5 of the Rules and Regulations of the United States Securities and Exchange Commission, Title 17, Code of Federal Regulations, Section 240.10b-5, by: (i) employing devices, schemes, and artifices to defraud; (ii) making one or more untrue statements of material fact and omitting to state one or more material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which would and did operate as a fraud and deceit upon one or more investors and potential investors in HyperFund, in connection with the purchase and sale of investments in HyperFund's investment programs directly and indirectly, by use of means and instrumentalities of interstate commerce and the mails, contrary to Title 15, United States Code, Sections 78j(b) and 78ff.

13. It was further part of the conspiracy that **LEE** and his co-conspirators knowingly devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of false and fraudulent pretenses, representations, and promises, and would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, certain writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

14. It was further part of the conspiracy that **LEE** and his co-conspirators made and caused to be made materially false and fraudulent pretenses, representations, and promises, and concealed and caused others to conceal material facts from, investors and potential investors,

regarding HyperFund's purported investment platform, expected investment returns, and the use of investors' funds.

15. It was further part of the conspiracy that **LEE** and his co-conspirators used interstate and foreign wire communications to encourage investors, including in the District of Maryland, to invest in HyperFund.

### Overt Acts

16. In furtherance of the conspiracy and to effect the illegal objects above, the following acts, among others, were committed in the District of Maryland and elsewhere:

17. In approximately June 2020, **LEE**, his co-conspirators, and others formed HyperFund.

18. In or around February 2021, **LEE** and his co-conspirators offered and sold investment contracts to the public, including investors residing within the District of Maryland, through HyperFund's online investment platform.

19. In or around February 2021, using interstate wire communications, CHUNGA caused a video to be published to social media in which she fraudulently stated that HyperFund was "offering . . . an opportunity to earn rewards from blockchain technology and the biggest wealth transfer ever," and was the "world's most sustainable passive rewards program" (the "February 2021 presentation").

20. The February 2021 presentation included the following materially deceptive slides:



# HYPER TECH — WE'RE BUILDING THE BIGGEST BLOCKCHAIN COMMUNITY

## BECOME A MEMBER

TRILLIONS OF DOLLARS ARE POURING INTO BLOCKCHAIN PROJECTS & DeFi (DECENTRALISED FINANCE) THIS DECADE

HYPERFUND IS OFFERING YOU AN OPPORTUNITY TO EARN REWARDS FROM BLOCKCHAIN TECHNOLOGY & THE BIGGEST WEALTH TRANSFER EVER



© 2019/2020
No recordings allowed

A UNIQUE ONCE IN A LIFETIME OPPORTUNITY

---



# HYPER TECH — LEARN, REWARDS, SPECULATE — THE OPPORTUNITY

## HYPERFUND
### PART 1
### THE WORLDS MOST SUSTAINABLE PASSIVE REWARDS PROGRAM



HyperFund Global

© 2019/2020
No recordings allowed

A UNIQUE ONCE IN A LIFETIME OPPORTUNITY



21. The February 2021 presentation fraudulently claimed that investors who purchased "memberships" would receive between 0.5% to 1% daily in passive rewards until the company either doubled or tripled the investor's initial investment.

22. The February 2021 presentation also fraudulently claimed that an investor who invested $1,000 would receive $150 per month, and that in 20 months, the investor would receive $3,000.







23. To convince investors that HyperFund could make such payments, HyperFund fraudulently claimed, for example in the February 2021 presentation, that its payments would be

- 8 -

disbursed in part from its revenues from large-scale crypto mining operations, when in truth and fact, HyperFund did not have such operations:




24. HyperFund, in truth, did not pay investors between 0.5% to 1% daily in passive rewards as promised. Instead, while investors initially were able to withdraw their funds, HyperFund eventually blocked investor withdrawals, beginning in at least July 2021.

25. In or about June 2021, the conspirators caused to be released a video of an individual identified as the "Compliance Director" for HyperFund. In truth, the "Compliance Director" was introduced under a fake name and had a prior federal conviction for wire fraud.

26. On or about July 22, 2021, the "Compliance Director" appeared on a public YouTube video about HyperFund titled, "THIS IS WHY THIS IS LEGIT[.]" The video falsely claimed that the "Compliance Director" had "worked in the compliance industry for more than a decade" and that she was "brought on board by HyperFund to tackle the challenging compliance issues that the project is facing, especially due to exploding growth."

27. In that same video, the "Compliance Director" claimed that HyperFund was a "membership rewards plan" similar to "American Express." The "Compliance Director" stated that "HyperFund takes compliance rules extremely important [sic]" and that HyperFund was "not subject to oversight by the SEC" and "legal in every jurisdiction in the world."

28. In or about February 7, 2023, **LEE** stated to a HyperFund investor that "billions" were lost in HyperFund, and that "because I'm responsible for letting it get out of hand, I'm willing to therefore put more energy to make things right."

29. On or about July 23, 2023, **LEE** announced that he was "rebuilding" Hyperfund.

30. From in or about June 2020 to in or about November 2022, **LEE** and others known and unknown to the Grand Jury caused investors to contribute a total of at least $1.89 billion to HyperFund.

31. HyperFund never registered its investment platform as an offering and sale of securities with the SEC; nor did it have a valid exemption from this registration requirement.

## FORFEITURE ALLEGATION

The United States Attorney for the District of Maryland further alleges that:

1. Pursuant to Fed. R. Crim. P. 32.2, notice is hereby given to the defendant that the United States will seek forfeiture as part of any sentence in accordance with 18 U.S.C. § 981(a)(1)(C) and (b)(1), 21 U.S.C. § 853(p), and 28 U.S.C. § 2461(c), in the event of the defendant's conviction under Count One of this Indictment.

2. Upon conviction of the offense alleged in Count One of this Indictment the defendant,

**SAM LEE,**

shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of such offense.

3. The property to be forfeited includes, but is not limited to, a forfeiture money judgment in the amount of approximately $1.89 billion.

### Substitute Assets

4. If, as a result of any act or omission of the defendant, any of the property described above as being subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or,

   e. has been commingled with other property which cannot be divided without difficulty,

the United States shall be entitled to forfeiture of substitute property up to the value of the forfeitable property described above pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C

§ 982(b)(1) and 28 U.S.C. § 2461(c).

18 U.S.C. § 981(a)(1)(C) and (b)(1)
21 U.S.C. § 853(p)
28 U.S.C. § 2461(c)

- 13 -

Date:

_____
Erek L. Barron
United States Attorney

_____
Glenn S. Leon
Chief, Fraud Section

SIGNATURE REDACTED
FOREPERSON

01-25-2024
Date

- 13 -